## ARMOUR & COMPANY *v.* BLOCK.

1. Where the owner of a vacant city lot entered into a written contract to build a storehouse with one who was to become the tenant of the owner, and the contract provided that "It is mutually agreed that any fixtures, additions, or improvements made, added to, or installed in said demised premises by lessee during its occupancy thereof shall be and remain its property, and it shall have the right to remove same at any time, provided any damage occasioned by such removal shall be repaired by lessee at its expense;" and where the landlord and the tenant afterward entered into a supplemental contract, before the main storeroom was completed, which provided that the tenant should furnish the sum of $4,000, for which the landlord agreed to erect, at the same time the main storeroom was constructed, an addition as a "smokehouse," to be constructed in a specified way, such addition being necessary for the use of the tenant as an accessory to its "packing-house business," and such addition was made along with the building of the main room; and where the tenant went into possession of the premises on completion of the building and used the main room and the "smokehouse" (which was and could be used by the tenant only for smoking meat) until just before the expiration of the lease, when the tenant removed the "smokehouse," it was error, on the trial of a suit brought by the landlord to recover damages for the removal, for the court to instruct the jury: "I charge you as the law of the case, under the facts that are in evidence, that [the tenant] did not have a legal right to remove the smokehouse; that under the facts in evidence, and under the law, that the smokehouse was the property of [the landlord], and therefore when [the tenant] moved the smokehouse, were without and beyond their legal rights in doing so; and the only question therefore left in the case is, what amount [the landlord] was damaged in a legal sense, what damage is he entitled to recover in this suit by reason of the removal from the premises of that structure, or that part of the structure known as the smokehouse."

(*a*) Such smokehouse was a "trade-fixture," and could be removed as such.

(*b*) Giving the two contracts a reasonable construction, it was the intention of both parties that the smokehouse was to be treated as a trade-fixture, and that it could be removed by the tenant before the expiration of its term.

(*c*) The landlord can recover of the tenant such structural damages, if any, as accrued to the main building by the removal of the trade-fixture by the tenant.

No. 260.　FEBRUARY 15, 1918.

Equitable petition.　Before Judge Mathews.　Bibb superior court.　March 8, 1917.

*Miller & Jones,* for plaintiff in error.

*John R. L. Smith, Grady C. Harris,* and *Robert W. Barnes,* contra.

HILL, J. When this case was before this court on a former occasion the judgment of the lower court was affirmed. It was then ruled as follows: "1. Under the allegations in the petition, there was no error in refusing to dismiss it on general demurrer. 2. Where one succeeding to the rights of a lessor filed an equitable petition against one who succeeded to the position of the original lessee, praying for an injunction to restrain the latter from removing certain fixtures from the premises, and the restraining order first granted was rescinded upon the defendant's giving a bond to pay such damages as it might be found the plaintiff suffered by reason of the removal of such things from the premises, if it should be found that the removal was illegal, the giving of such a bond, or the removal of the property, would not furnish cause for dismissing the case. If damages covered by the order and bond should be established at the trial, they could be recovered under the prayer for general relief." *Armour* v. *Block,* 144 *Ga.* 295 (87 S. E. 18). A substantial statement of the plaintiff's petition appears in the report of that case. On the return of the case to the lower court it was tried, and the verdict, under the evidence and the charge of the court, was in favor of the plaintiff for the full amount of the proved value of the "smokehouse" which had been removed by the defendant. The allegation in the petition with reference to the trade-fixtures it may be important to repeat here. It was as follows: "That during the course of construction of said building, etc., described in said lease, and before the completion, acceptance, and occupancy of the same on the part of the lessee named therein, a certain cooling room, smoke-room, elevator, refrigerator, cold storage ice-boxes with insulation and other fixtures, not being trade-fixtures but attached to and forming a part of the realty, were constructed as part of the said demised premises," etc. It is to be noted that the former decision of this court was on demurrer, and was predicated on "the allegations of the petition," one of which was that the fixtures were *not* trade-fixtures but were attached to and formed a part of the realty. Under such allegation this court held that the trial court did not err in overruling the general demurrer to the petition. There the demurrer admitted the allegation that the fixture was not a trade-fixture. But the record now presents a different aspect. Here the contest is largely, if not entirely, an issue of whether the smokehouse as

constructed was a trade-fixture and could be removed by the tenant before the expiration of the lease, as a matter of law, and also as a matter of contract. We will consider first the question whether the smokehouse was a trade-fixture as a matter of law and could be removed independently of any special contract to that effect. We will not discuss the question as to what constitutes a mere fixture, as it is not contended that the building in controversy is not a fixture, but whether it is a *trade-fixture* and can be removed in either or both of the above ways.

Various definitions of "trade-fixtures" are given in other jurisdictions. See 4 Words and Phrases (2d ed.), 956. In 19 Cyc. 1065, it is said: "There is no precise definition of a 'trade-fixture.' In England it does not include additions by a farmer in aid of agriculture, but this distinction does not exist in the United States. Where additions to the realty are to the pecuniary advantage of the tenant, they are probably 'trade-fixtures.'" In Bronson on Fixtures, § 33, it is said: "Articles attached to or erected upon the realty by the tenant for the purpose of assisting him in carrying on a trade are removable by him during his tenancy. . . The English decisions, particularly those of an early date, accorded to the tenant the right to remove his trade-fixtures during his term, provided that they were not so annexed as to materially injure the realty in their removal, or to cause the articles themselves to be reduced to a mere mass of crude materials, or to be destroyed. This general principle is followed, in its general tenor, by the American decisions, although there is a considerable respectable authority giving the right of removal of a trade-fixture to a tenant, irrespective of the fact that the articles, by their removal, may lose their essential characteristics as chattels, or be practically destroyed. This holding is upon the principle that the landlord can not be affected by injury done by the tenant to his own property, so long as the freehold is not damaged." In Martin v. Roe, 7 El. & Bl. 237, Lord Campbell said, in regard to injury by removal: "In all cases of this kind, injury to the freehold must be spoken of with less than literal strictness. A screw or a nail can scarcely be drawn without some attrition; and when all the harm done is that which is unavoidable to the mortar laid on the brick walls, this is so trifling that the law, which is reasonable, will regard it as none. Upon any other principle, the criterion of injury to the

freehold would be idle." In Wiggins Ferry Co. *v.* Ohio &c. Ry. Co., 142 U. S. 396 (12 Sup. Ct. 188, 35 L. ed. 1055), it was said, obiter, that "it is difficult to conceive that any fixture, however solid, permanent, and closely attached to the realty, placed there for the mere purposes of trade, may not be removed at the end of the term." In Moore *v.* Wood, 12 Abb. Pr. (N. Y.) 393, a brick chimney sunk three feet into the ground for a foundation, and not removable without being taken down in pieces, was held to be removable by the tenant. The court said: "The rigor of the ancient law of fixtures has yielded, and must continue to yield, to the contingencies of modern times. The law must take notice of trade and manufactures and their wants, and afford to them adequate and appropriate protection." A vault built within a building for banking purposes, and a safe built within the vault, and too large to be removed without tearing down the vault, were both held to be trade-fixtures and to be removable. Dostal *v.* McCaddon, 35 Iowa, 318. So a shed, stable, storeroom, and barn so erected and built upon and in a side hill as to be removable only upon being taken down, were held to be trade-fixtures. Dubois *v.* Kelly, 10 Barb. (N. Y.) 496; and see Cromie *v.* Hoover, 40 Ind. 49; White's Appeal, 10 Pa. St. 252. See also Baker *v.* McClurg, 198 Ill. 28 (64 N. E. 701, 59 L. R. A. 131, 92 Am. St. R. 261), where it was held that ovens upon brick foundations of their own, an engine and a boiler, the latter encased in a jacket of brick masonry, put there by tenants, were removable as trade-fixtures, although they would be more or less injured by removal and would have to be taken down in pieces. In Van Ness *v.* Pacard, 2 Pet. 137 (7 L. ed. 344), the court said: "But the question whether removable or not does depend upon the form or size of the building, whether it has a brick foundation or not, or is one or two stories high, or has a brick or other chimney. The sole question is whether it is designed for purposes of trade or not. A tenant may erect a large as well as a small messuage, or a soap boilery of one or two stories high, and on whatever foundations he may choose." The principle ruled above is recognized in *Carr* v. *Georgia Railroad,* 74 *Ga.* 73, but what is there said seems to be obiter dictum. See *Charleston &c. Ry. Co.* v. *Hughes,* 105 *Ga.* 1, 25 (30 S. E. 972, 70 Am. St. R. 17). The Van Ness case, *supra,* is said to present the extreme view of the American cases on the question of injury by

removal. "To constitute any chattel that has been attached to the freehold a trade-fixture, it is only necessary that it be devoted to what is known in the law of fixtures as a trade purpose, and, as the majority of the courts require, be removable without material injury to the premises, or the essential characteristics of itself as a chattel. The form or size of the annexed chattel is immaterial. Large buildings, such as stores, barns, and ice-houses, and heavy machinery, such as engines, boilers, and all kinds of manufacturing machinery, have been held trade-fixtures." Bronson on Fixtures, §33b.

Our Civil Code provides that a "tenant has no right beyond the use of the land and tenements rented to him, and such privileges as are necessary to the enjoyment of his use. He can not cut or destroy growing trees, remove permanent fixtures, or otherwise injure the property" (§ 3695); and that "a tenant during the term or a continuation thereof, or while he is in possession under the landlord, may remove fixtures erected by him. After the term and possession are ended, they are regarded as abandoned to the use of the landlord, and become the latter's property" (§ 3696). This court, Mr. Justice Little delivering the opinion, construed the section last quoted to refer to trade-fixtures. *Wright* v. *Du-Bignon*, 114 *Ga.* 765 (40 S. E. 747, 57 L. R. A. 669). It was held in that case that it is the general rule, in the absence of a contract giving him the right to do so, that the tenant can not remove fixtures annexed to the freehold, which he has placed on the land, and that the exception to this rule exists only in the case of trade-fixtures.

The record in this case shows that early in 1909 the Massee & Felton Lumber Company, which owned a vacant lot in Macon, agreed to erect and equip two storerooms under a single roof for two tenants, the National Packing Company and Cudahy & Company. The length of the building was to be approximately 110 feet, and 40 feet wide in front for each store. Each of the two tenants was engaged in the "packing-house business." The same architect and the same contractor were employed in the drawing of plans and erection of each store. On April 15, 1905, the Massee & Felton Lumber Company as lessor entered into a lease contract with the National Packing Company as lessee, by the terms of which the former was to erect for the latter a building of certain

dimensions and with certain equipment, suitable for the packing business. The tenancy was to begin as such on the completion of the building and the acceptance and occupancy by the lessee. The lessee, its successors and assigns, was to have the right to renew its lease at the expiration of the term of five years. One hundred dollars per month rent was to be paid for the first five years, and, in case of renewal, $125 per month. Rent was to begin on the completion, acceptance, and occupancy of the building; and on the termination of the lease or any renewal thereof the lessee was to surrender the premises in as good condition as they were in when accepted, ordinary wear and tear excepted. The contract contained the specifications of the items of equipment to be installed in the building by the landlord; and it contained also this agreement: "It is mutually agreed that any fixtures, additions, or improvements made, added to, or installed in said demised premises by the lessee during its occupancy thereof shall be and remain its property, and it shall have the right to remove same at any time, provided any damage occasioned by such removal shall be repaired by lessee at its expense." The contract also provided that "it is agreed by both parties hereto, that the covenants, agreements, and specifications herein contained shall be taken and regarded as conditions, and shall be equally binding upon the successors or assigns of the respective parties hereto." On July 14, 1909, an additional agreement was entered into between the Massee & Felton Lumber Company as landlord and the National Packing Company as tenant. By the provisions of this additional agreement the National Packing Company was to furnish the sum of $4,000, for which the Massee & Felton Lumber Company was to have erected, at the same time that the original store was erected, a smokehouse addition with certain fixtures attached thereto as agreed upon. The smokehouse attachment was approximately about 12x20 feet divided by a brick wall into two compartments approximately 6x10 feet. The main store, with its equipment and the smokehouse attachment, was completed about December 1, 1909, and the National Packing Company went into possession of the premises as tenant and paid the agreed rent to Massee & Felton Lumber Company. In 1910 the last-named company sold the property to the Continental Trust Company of Macon, and the National Packing Company paid rent to the new owner until September, 1912, when Armour & Com-

pany purchased the leasehold interest of the National Packing Company. On February 5, 1913, the Continental Trust Company sold its interest to Isaac Block, who thus became the landlord and Armour & Company the tenant. Armour & Company paid rent to Block until October 1, 1914, when the lease terminated. During the summer of 1914 Armour & Company removed from the end of the storeroom the smokehouse and fixtures placed therein and shipped them away. When Block learned of the intention of Armour & Company to remove the fixtures, he filed a petition in the superior court, setting up that the fixtures which it was intended to remove were not trade-fixtures; and that they were not erected during the *occupancy* of the premises by either the National Company or Armour & Company. For a fuller statement of the petition see *Armour* v. *Block,* supra. On the trial of the case the evidence for the defendant tended to show that the smokehouse and its equipment was constructed in a specified way under the supplemental contract of July, 1909, for the special use of the tenant, and was necessary to the tenant in smoking meat and in the packing-house business; that the cost of it was paid by the National Packing Company, the original lessee; that the smokehouse added little or no value to the main storeroom for general purposes, and that its removal therefrom would not lessen the value of the main store to tenants engaged in a general mercantile business. The court instructed the jury: "I charge you as the law of the case, under the facts that are in evidence, that Armour & Company did not have a legal right to remove the smokehouse; that under the facts in evidence, and under the law, that the smokehouse was the property of Isaac Block, and therefore when Armour & Company, when they moved the smokehouse, were without and beyond their legal rights in doing so; and the only question, therefore, left in the case is, what amount Isaac Block was damaged in a legal sense, what damage is he entitled to recover in this suit by reason of the removal from the premises of that structure, or that part of the structure known as the smokehouse." Under the facts as they appear in the record the judge was not authorized to give this instruction. We think that the smokehouse was a trade-fixture and could be removed by the tenant before the expiration of its lease. *Mayor etc. of Gainesville* v. *Dunlap,* 147 *Ga.* 344 (94 S. E. 247). The damages, if any, are such as occurred to the main structure in removing the trade-fixture.

In addition to what has been said, while the contract is not entirely free from ambiguity, yet, giving it a reasonable construction, we think it was in contemplation of the parties that the fixtures or "improvements made" could be removed by the tenant or the assignee of the original tenant, before the expiration of his term.· See, in this connection, *Power* v. *Garrison,* 141 *Ga.* 429 (81 S. E. 225) ; 11 R. C. L. 1070, 1071, § § 14, 15. There is no question that the tenant paid a large sum to have the smokehouse constructed in the manner specified for trade purposes, and that it was peculiarly necessary for the conduct of the packing-house business. But it is contended that under the contract, in order for the tenant to have the right to remove the smokehouse, it must have been added to or installed in said demised premises during the tenant's occupancy thereof, whereas it was placed there before the tenant took possession. Technically this was true. Yet it was placed there at the request and at the expense of the tenant, which entered into an agreement subsequently to the first for that purpose, and which paid for the smokehouse the sum of four or five thousand dollars. Under such circumstances, and construing both contracts together, it would be a strange construction of them to hold, under the peculiar facts of this case, that the tenant must be in *actual* possession when the smokehouse was constructed, before the tenant would be entitled to remove it. We think that the case should go back to be tried on the sole issue of whether the removal of the smokehouse caused any structural damage to the main building; and if so, how much.

*Judgment reversed. All the Justices concur.*

GILBERT, J., concurs in the judgment, in view of the contract between the parties, which permitted the removal of any "additions or improvements made, added to, or installed in" the premises.